UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

MATTHEW T. DENHOLM, REGIONAL   )
DIRECTOR OF THE NINTH REGION   )
OF THE NATIONAL LABOR          )
RELATIONS BOARD, FOR AND ON    )          No. 5:20-CV-320-REW
BEHALF OF THE NATIONAL LABOR   )
RELATIONS BOARD                )
                               )
          Petitioner,          )
                               )
v.                             )          OPINION & ORDER
                               )
SMYRNA READY MIX CONCRETE,     )
LLC,                           )

          Respondent.

                    ***   ***   ***   ***

In concrete, a bad mix or a bad pour offers no easy remedy. Often, the result is a jackhammer and a restart. In this case, the National Labor Relations Board (the Board) pursues a well-founded case over alleged unfair labor practices at a Winchester, Kentucky concrete plant. The need to return to square one here also applies, at least while the Board does its work. Staying in the proper procedural lane, the Court views the claims as supported by (at least) reasonable cause. Temporary relief, with a return to the status quo ante is, upon consideration of all factors, a just and proper result. This Order undoes the effects of the suspect practices pending the Board's adjudication.

Petitioner, Matthew T. Denholm, Regional Director of the Ninth Region of the Board, petitions the Court for a preliminary injunction under Section 10(j) of the National Labor Relations Act (the Act). DE 1. The Board moved for resolution of the petition on the filings, without an evidentiary hearing. DE 13. The Court reserved ruling on the motion and set a briefing schedule.

1

DE 20. Respondent, Smyrna Ready Mix Concrete, LLC, (Smyrna) responded to the petition. DE 25. The Board replied. DE 31. The Court, after reviewing the parties' filings, **GRANTS** DE 13[1]. The matter is now ripe for review. The Court finds the Board's motion well-warranted and also **GRANTS** DE 1 on the terms of this Order.

## I.       BACKGROUND

The record supports the following depiction.[2] The Court acknowledges that the record features many conflicting witnesses with conflicting stories. The Court sees that much of the case hinges on credibility, motive, timing, and consistency. This is not a decision; this is a recital of the events founded on a reasonable and substantial reading of the full record:

Smyrna makes ready mix concrete and provides concrete hauling and pumping services. R. at 20.[3] Smyrna acquired the Winchester plant with two other plants[4] in central Kentucky in 2017. R. at 733. Aaron Highley was the manager of the plant during the acquisition and retained the position after Smyrna bought the plants. *Id.* In 2018, Ben Brooks became the general manager over the Central Kentucky region of the company, encompassing 15 plants. R. at 685–86.

---

[1] There's little light between the parties' positions here. The case rests on a 2000-page record, the result of a 7-day administrative trial. Needless to say, the parties have had ample time and space to explicate their positions.

[2] The Court, pursuant to its subordinate role in the § 10(j) context, does not make factual findings. *Cf. Muffley v. Voith Industrial Services, Inc.*, F. Supp.2d 667, 669 n.1 (W.D. Ky. 2012) *aff'd sub nom Muffley ex rel. N.L.R.B. v. Voith Indus. Services, Inc.*, 551 F. App'x 825, 830 (6th Cir. 2014) (noting that "the court finds no facts" and instead provides facts "in order to give context to the request for relief") This factual recitation is based upon the administrative record provided. As described *infra*, the Court probes this record to see if "facts exist which could support the Board's theory[.]" *Schaub v. West Michigan Plumbing & Heating, Inc.*, 250 F.3d 962, 969 (6th Cir. 2001).

[3] The administrative transcript spreads across 7 different volumes. DE 1-25 (pages 1–272); DE 1-15 (pages 273–513); DE 1-16 (pages 514–773); DE 1-17 (pages 774–1028); DE 1-18 (pages 1029–1322); DE 1-19 (pages 1323–1540) DE 1-20 (pages 1541–1723). This decision cites to individual pages by the R. # page designation.

[4] The other Lexington-area plants are located in Georgetown and Nicholasville, Kentucky. R. at 733.

In spring of 2019, the Winchester plant frequently dispatched its drivers to assist Smyrna's Florence, Kentucky plant. R. at 230–31. For the most part, because of the distance and long days, the drivers refused to volunteer for these assignments. R. 120–21. According to driver Sunga Copher[5], Highley was instructed by Brooks to fire drivers if they refused an assignment to go. R. at 179.[6] Around this time, the drivers began to discuss organizing a union. R. at 50–51. In October 2019, Copher contacted Teamsters Local 89. R. at 51–52. On November 7, 2019, Copher and two other drivers met with Teamsters Vice President John Palmer to discuss a union organization campaign. R. at 56–57, 365–66.

On November 8, 2019, Brooks heard about a meeting, and the record reasonably supports that he heard the meeting involved Copher and union activity. R. at 1092–93.[7] On the morning of November 8, Winchester driver Nicole Long drove to the Georgetown plant where she had a conversation with Roy Chastain and Jeff Rod[8] about the union meeting. R. at 1687–89.[9] Chris Newell, a salesman for Smyrna, overheard the conversation. R. 1350. Newell, no more than five minutes after overhearing the conversation, R. at 1388, called Brooks to inform him of what he had heard. R. 1093–94, 1387–88.

---

[5] Sunga Copher is Aaron Highley's nephew; the familial relationship was known at the plant. R. 80.

[6] When asked, Highley agreed that "refusing to go someplace as dispatched" would be "a reason somebody should be disciplined," "a pretty significant offense," and would qualify as "insubordination[.]" R. at 796–97. The ALJ noted that "Respondent did not fire anyone for refusing to go [to Florence] or refusing to volunteer to travel there." DE 26-1 at 8 n.12 (ALJ Decision).

[7] Highley testified that Brooks directly asked about union activity and whether the meeting was about union activity. R. 748–49. Brooks denied this. R. at 1107.

[8] The record is inconsistent on Jeff's name. *See* R. at 35 (Copher calling him "Jeffrey Rudd"); R. at 1386 (Newell calling him "Jeff Rod"); R. at 1688 (Long calling him "Jeff Ray"). The ALJ used Rod and the Court, to avoid confusion, will use that name. DE 26-1 at 3.

[9] Long told Chastain and Rod that she was afraid to attend the meeting "because I was in fear for my job[.]" R. at 1688.

3

Brooks allegedly asked Highley to investigate what the meeting was about and to provide names of employees involved in possible union activity. R. at 749–50; 753 ("just make me a list"). Brooks, who rarely came to the plant, the same day, met with and fired Copher. R. at 61. Brooks arguably confirmed to Copher that he was at the plant to see him over the union "and other things too." R. at 1190. A tape of the interaction unmistakably confirms a reference by Copher to "union" and Brooks using the phrase, relative to the encounter, "and other things too." DE 19. Brooks, without elaboration, gave Copher a termination notice stating that he was being fired for "negative attitude and overall job performance was poor." DE 11-1 at 93. Highley told Brooks he did not approve of the termination decision, but Brooks justified the firing by saying "we are not going to try to run a company with our hands tied behind our back. I will shut this place down first." R. at 751–52.

On November 15, 2019, Brooks conducted a safety meeting (ostensibly) at the Winchester plant. R. at 1109. Per some witnesses, Brooks commended the drivers' performance and, immediately prior, praised Highley's management of the plant. R. 306–07, R. 648–49. Brooks also told the Winchester drivers that they could contact him on his personal cell phone if they had any issues they wanted to address. R. at 1110–11. At the end of the meeting, Brooks handed each employee $100 in cash. R. at 1111–12. Brooks claims that the cash was intended to be a "morale boost" to the Winchester plant. R. at 1112. He thought it would "push them" to do what he was asking. *Id.* He called the meeting because he sensed a need to "clear the air" at the plant. R. at 1110.

On November 18, 2019, Brooks abruptly fired Highley. R. at 761. At the termination meeting, Brooks allegedly told Highley that "he gave [Highley] a week" to get him a list of union supporters but that Highley had failed to do so. *Id.* Notably, prior to the Copher and Highley firings,

Neither Brooks--nor Smyrna--had counselled or disciplined either in any way. R. at 46; R. at 74; R. at 763; R. at 844. Copher's firing occurred the day after the union meeting, the day Brooks learned of the drivers' confab. Highley was fired ten days later, and the next business day following the November 15 group session between Brooks and the Winchester plant.

Following the termination, Brooks traveled to the Winchester plant more often. R. at 185. He installed a new management team and looked to hire a new manager and additional drivers. R. at 913–14. Despite that, in January 2020, Brooks told the remaining Winchester drivers that the Winchester plant would be closing and that the drivers would be terminated. R. at 196, 566, 656. He told them that they could be rehired when the plant reopened in the spring. *Id.* Brooks then offered the remaining drivers the choice between two weeks' pay or four weeks' pay conditioned on a separation agreement. R. at 570, 663. The separation agreement included a broad waiver and a covenant "not to persuade or instruct any person to file a suit, claim, or complaint with any state or federal court or administrative agency[.]" *See* DE 11-4 at 4.  It also included a rangy non-disparagement provision and a covenant not to reapply or accept re-employment at Smyrna. *See id.* at 5, 6. Six drivers signed the separation agreement. DE 11-1 at 100 (Nicole Long), 108 (Jason Means), 126 (Sheldon Walters), 147 (Randal Carmichael), 154 (James Bowling), 161 (David Smith).

Smyrna, however, did not fully close the plant. Instead, it was converted to an "on-demand" facility. R. at 922–23. Other drivers from nearby plants travel to Winchester to service the facility, when operating, and all of the plant's regular work went to the Georgetown or Nicholasville plants. R. at 723–24. Two mechanics continue to operate at the Winchester facility full time. R. at 724.

Between November 2019 and April 2020, Teamsters Local 89 filed numerous charges against Smyrna. *See* DE 1-2; DE 1-3; DE 1-4; DE 1-5; DE 1-6; DE 1-7; DE 1-8; DE 1-9. On May

13, 2020, the General Counsel of the Board consolidated the charges. DE 11-1 at 38–45 A trial occurred before Administrative Law Judge (ALJ) Arthur Amchan beginning on June 29, 2020 and concluding, with gaps, on July 15, 2020. *See* R. at 1, 1541. The Board filed its injunction request on July 23, 2020. DE 1 at 10. The briefing closed in October, and the Court has carefully reviewed the voluminous record.

In the interim, the ALJ delivered his decision on September 1, 2020. DE 26-1 at 30. The ALJ found multiple violations of the Act (to include: the discharges of Copher, Highley, and the drivers; impropriety in the November 15 "safety" meeting, illegality in the plant closure, and illegality in the separation agreements). *See* DE 26-1 at 2. The ALJ recommended broad equitable and other relief. *Id.* at 32–34. The matter now pends before the Board on exceptions. *See Smyrna Ready Mix Concrete, LLC*, National Labor Relations Board (N.L.R.B.) Case Number 09-CA-252487, https://www.nlrb.gov/case/09-CA-252487.

## II.   STANDARD

Section 10(j) of the NLRA allows the Board to petition a proper district court "for appropriate temporary relief or restraining order." 29 U.S.C. § 160(j). This permits the Board to exercise "a means of preserving the status quo pending completion of its regular procedures, which might be ineffective if immediate relief cannot be granted." *Calatrello v. Automatic Sprinkler Corp. of Am.*, 55 F.3d 208, 214 (6th Cir. 1995) (internal quotation marks and citations omitted).

Section 10(j) relief may be granted if the Court finds that "there is 'reasonable cause' to believe that unfair labor practices have occurred." *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 234 (6th Cir. 2003) (quoting *Schaub v.*, 250 F.3d at 969).[10] "The Board's burden in establishing

---

[10] Smyrna challenges the two-prong standard and argues that *Winter v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365 (2008) has changed the test. DE 25 at 4. However, Smyrna concedes that no Sixth Circuit decision has addressed the issue. *Id.* at 5. Moreover, since the decision in

reasonable cause is 'relatively insubstantial.'" *McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333, 339 (6th Cir. 2017) (quoting *Schaub*, 250 F.3d at 969). The Board must only show that its "theory is substantial and not frivolous." *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 29 (6th Cir. 1998). "[T]he Board must present enough evidence in support of its coherent legal theory to permit a rational factfinder, considering the evidence in the light most favorable to the Board, to rule in favor of the Board." *Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 371 (11th Cir. 1992); *see also Glasser ex rel. NLRB v. ADT Sec. Services, Inc.*, 379 F. App'x 483, 486 (6th Cir. 2010) (describing the *Arlook* approach as "consistent with our precedent").

Once reasonable cause surfaces, "the court must determine whether injunctive relief is 'just and proper.'" *Schaub*, 250 F.3d at 969 (quoting *Fleischut*, 859 F.2d at 29); § 160(j) ("as it deems

---

*Winter*, the Sixth Circuit has continued to apply the two-pronged test. *See, e.g., Glasser v. Comau, Inc.*, 767 F. Supp.2d 778 (6th Cir. 2011); *McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333 (6th Cir. 2017). The Court is bound by and must follow well-established Circuit law. *See Brown v. Cassens Transport Co.*, 492 F.3d 640, 646 (6th Cir. 2007) (noting that courts are not at liberty to reverse a circuit's precedent absent a Supreme Court decision or a decision of the Circuit sitting *en banc*). *Winter*, of course, was not a 10(j) case. Other Circuits that have wrestled with the question have decided that *Winter* is largely subsumed in the two-step analysis anyway. *See, e.g., McKinney ex rel. N.L.R.B. v. Creative Visions Res., L.L.C.*, 783 F.3d 293, 297–98 (5th Cir. 2015) (discussing the Third Circuit's treatment and agreeing that "our two-prong review of § 10(j) petitions for injunctive relief is not inconsistent with Supreme Court precedent"). Regardless, the *Winter* decision would ultimately not change the calculus—the Court's analysis tracks with *Winter*'s requirements. The reasonable cause determination shadows whether the Board is "likely to succeed on the merits." *Winter*, 129 S. Ct. at 364. The Court's just and proper analysis considers whether "irreparable harm" is likely without relief, whether "the balance of equities" favor granting relief, and whether the injunction is "in the public interest." *Id.* Smyrna's rigid approach to *Winter* is also contrary to the equitable considerations of injunctive relief. For example, and applicable here, "the degree of likelihood of success required to support a grant of a preliminary injunction may depend on the strength of the other factors considered." *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994) (quoting *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)); *cf. Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286–87 (7th Cir. 2001) ("The strength of the Director's case on the merits affects the court's assessment of the relative harms by the grant or denial of injunctive relief: the greater the Director's prospects of prevailing are, the less compelling need be his showing of irreparable harm in the absence of an injunction." (*citing NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1556 (7th Cir. 1996), *cert denied*, 117 S. Ct. 683 (1997)).

just and proper"). "A temporary injunction is just and proper where it is 'necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA, and whether achieving status quo is possible.'" *McKinney*, 875 F.3d at 339 (quoting *Gottfried v. Frankel*, 818 F.2d 485, 495 (6th Cir. 1987)).

The Court carefully respects that its role in these circumstances is "limited[.]" *See McKinney*, 875 F.3d at 339. "[S]ection 10(j) proceedings are merely ancillary to unfair labor practice proceedings to be conducted before the Board." *Fleischut*, 859 F.2d at 28 (citation omitted). The Court's role under Section 10(j) "is to preserve the status quo until the '*completion* of [the Board's] regular procedures.'" *McKinney*, 875 F.3d at 339 (quoting *Kobell for & on Behalf of NLRB v. United Paperworkers Int'l Union, AFL-CIO, CLC*, 965 F.2d 1401, 1409–10 (6th Cir. 1992) (emphasis added)). Thus, the Court "must be mindful not to adjudicate the *merits* of such charges in deciding whether to grant relief in the ancillary § 10(j) proceedings." *Muffley*, 551 F. App'x at 827.

In cases where an Administrative Law Judge has rendered a decision, as here, the Court is not "compelled to defer to it." *McKinney*, 875 F.3d at 339–40 (citing *Penello for & on Behalf of NLRB v. Int'l Longshoremen's Ass'n, Local 1248, AFL-CIO*, 455 F.2d 942, 943 (4th Cir. 1971)) (noting that the ALJ's decision "does not mark completion of the Board's proceedings). The ALJ issued a detailed, 30-page opinion that weighed fully the record, the testimony, and the legal standards. The Court is not mimicking the ALJ's adjudication, but in the assessment of reasonable cause, the studied product of a neutral decisionmaker surely is worthy of note in the calculus.

### III. ANALYSIS

The National Labor Relations Act grants employees the right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (Section 7 of the Act). The Act forbids "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). It is also unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of" their § 7 labor rights. 29 U.S.C. § 158(a)(1).

### a. Copher's and Highley's Discharges

The Board argues that the firings of Copher and Highley violated the Act. *See* DE 1-1 at 11–14. Claims of discrimination under the NLRA invoke a burden-shifting framework articulated in *Wright Line*, 251 N.L.R.B. 1083 (1980), and adopted by the Supreme Court in *NLRB v. Transportation Management Co.*, 103 S. Ct. 2469 (1983). *See Airgas USA, LLC v. NLRB*, 916 F.3d 555, 560–61 (6th Cir. 2019) (applying the framework). A prima facie case of discrimination under *Wright Line* requires three elements: "(1) [that] the employee was engaged in protected activity; (2) that the employer knew of the employee's protected activity, and (3) that the employer acted as it did on the basis of anti-union animus." *Airgas*, 916 F.3d at 561 (quoting *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 777 (6th Cir. 2002)).

The Court finds reasonable cause to believe that the discharges of Copher and Highley were unfair labor practices in violation of § 158(a)(3) and/or (a)(1). Copher was undoubtedly participating in protected activity by organizing and meeting with a union representative shortly before his termination. There is sufficient evidence in the record to support the Board's theory.

First, Brooks discussed the meeting with an employee at the Winchester plant before he traveled to the plant and fired Copher. R. at 1093, 1387–88. Second, Highley testified that Brooks explicitly asked him about the meeting and its relation to union activity. R. at 748–49. Finally, Brooks terminated Copher almost as soon as he learned about the meeting, and the termination discussion included some reference to union activity. R. at 61. "[T]he proximity in time between recent protected activity and measures taken against the employee engaged in the activity lend support to the inference of an unfair labor practice.'" *Schaub*, 250 F.3d at 970 (quoting *Jim Causley Pontiac v. NLRB*, 620 F.2d 122, 125 (6th Cir. 1980)). Fact questions aside, the Board's assertions have record support.

As for Highley, there also is enough evidence to support the Board's theory that Smyrna (via Brooks) terminated Highley for refusing to participate in anti-union activity. Only two days passed between the safety meeting, where Brooks allegedly and contemporaneously commended Highley's work, and Highley's termination. Highley testified that one of Brooks's stated reasons for terminating him was that he did not follow through on providing Brooks a list of employees engaged in union activity. R. at 761 The final determination of the weight and credibility to give to this testimony lies with the Board in its own proceedings. However, the Board has met its insubstantial burden to show reasonable cause for a violation of the Act. Again, the Court does not weigh the disputed record. The timing, particular allegations, and sworn proof all point to termination of the long-term, otherwise unblemished manager because he would not supply Brooks a participant roster. *See Lewis v. Whirlpool Corp.*, 630 F.3d 484, 488 (6th Cir. 2011) ("[A] supervisor *does* have a viable claim under the NLRA when terminated or otherwise disciplined for *refusing to commit* unfair labor practices."); *see also USF Red Star, Inc. v. NLRB*, 230 F.3d 102, 106 (4th Cir. 2000) ("Although supervisors are not explicitly covered by the NLRA, § 158(a)(1)

is violated if a supervisor's discharge results from his refusal to commit an unfair labor practice."). Adequate evidence supports the Board's substantial and nonfrivolous theory.

The Court must determine if the relief requested, reinstatement of Copher and Highley, is just and proper. Restoring the status quo prior to Smyrna's violation of the Act is possible. The termination of Copher and the subsequent termination of Highley were suggestive enough to Smyrna employees to chill their union activities. *See* R. at 432 ("[N]obody talked about [the union] anymore. We didn't want to risk our jobs."). The testimony provided here mirrors that in *Ahearn* where "the employees stopped wearing union buttons, spoke in hushed tones about union activities, and feared reprisal." 351 F.3d at 239. Thus, interim reinstatement is proper to mitigate that chilling and preserve the Board's remedial power. *See, e.g., Ahearn*, 351 F.3d at 239 (collecting cases).

Smyrna argues that evidence acquired after (perhaps during) the hearing purports to show that Copher would have been terminated based on independent grounds: Copher's attendance record. DE 25 at 10, 14–15. There is no evidence, however, that Smyrna, or certainly Brooks, regularly enforced the attendance policy that it now seeks to use against Copher to prevent reinstatement. *See* R. at 1606–10.[11] Further, Smyrna's manager, Highley, oversaw Copher through the period and neither he, nor Smyrna, disciplined Copher at any time for the alleged no-call, no-show listings. R. at 737 (discussing Highley "never having a reason" to discipline an employee). Thus, Smyrna has not established that the subsequent discovery of this evidence makes Copher

---

[11] The ALJ's decision notes that the record does not reflect any evidence suggesting actual enforcement of the policy. DE 26-1 at 26. Furthermore, the ALJ gave little weight to Respondent's argument because Respondent failed to produce evidence when "it was incumbent for Respondent to produce such evidence in the hearing on the merits because it raised the issue of its 'after-acquired' evidence in the merits proceeding." *Id.* Respondent argues it was not required to disclose such evidence. *Id.* While the Court is restrained from resolving the evidentiary issue, the absence of evidence in the record, here and before the ALJ, is not in dispute.

"unfit for further service, or a threat to efficiency in the plant." *See Hawaii Tribune-Herald* 356 NLRB 661, 662–63 (2011). Although there is some doubt, to the Court, over whether *Hawaii Tribune-Herald* sets the standard in a pre-discharge misconduct scenario, without question, Smyrna must show that it *would* have terminated Copher. Given that Highley, the manager with authority, knew about the events and took no action, and given that the incidents occurred over a year before discharge, the Court doubts sufficient linkage. The evidence, known to Smyrna, is hardly after-acquired. The Court does not find the alleged employment record sufficient to impact the justness and propriety of the reinstatement remedy.

> **b.**   Soliciting Grievances

The Board argues that Smyrna violated the Act when Brooks solicited grievances at the November 15 safety meeting. DE 1-1 at 12–13. "Absent a previous practice of doing so . . . the solicitation of grievances during an organizational campaign accompanied by a promise, expressed or implied, to remedy such grievances violates the Act." *Maple Grove Health Care Center*, 330 NRLB 775, 775 (2000) (citing, *Capitol EMI Music*, 311 NLRB 997 (1993), *enforced*, 23 F.3d 399 (4th Cir. 1994)). The solicitation itself is not unlawful; the promise "to remedy the grievances" raises an inference prohibited by the act. *See Amptech, Inc.*, 342 NLRB 1131, 1137 (2004), *enforced*, 165 F. App'x 435 (6th Cir. 2006).

There is reasonable cause to believe that Smyrna violated the Act when Brooks solicited grievances at the Winchester plant during the November 15 meeting. Smyrna does not argue that Brooks historically engaged in this practice. *See* DE 25 at 15. Rather, Smyrna claims that the Board has not fully developed its argument and, thus, waived the claim. *Id.* The Board has met its insubstantial burden of showing evidence in the record that Brooks solicited grievances. Brooks testified that he, in fact, solicited grievances at the meeting. R. at 1110–11 ("Then I spoke up. You

know, I was going to use my platform as like a morale booster, you would say, and I made a point to, you know, to make myself available. If anyone ever needed anything, they had my cell phone. Several of them called me in the past.[12] Made sure that everybody was able to reach me if they needed to. If there were any concerns, any issues they might have had about anything, I would make myself available to them."); R. at 1111 ("Q. Did you open the floor to people who raised concerns or anything? A. I did."). Taken in context, and under the apt standards, this overture carried with it a promise to address employee complaints. Notably, it came at the same time Brooks reported having eliminated the underlying Florence issue and when he handed out surprise cash. The Board supports its nonfrivolous theory.

The relief requested is just and proper. Smyrna claims the relief is unjust and improper because it would "place [Smyrna] at risk of a contempt proceeding based upon nothing but an allegation that it 'implicitly' promised any employees any benefits or solicited any employee grievances or complaints." DE 25 at 15. The requested relief, however, proscribes only "impliedly promising benefits by soliciting grievances *to discourage union activity*[.]" DE 1 at 9 (emphasis added). The Court's injunction is necessary to restore and ensure the status quo before Smyrna's violation of the Act.

### c.   $100 Cash Bonus

The Board argues that Smyrna violated the Act when Brooks gave employees at the Winchester plant a $100 cash bonus during the November 15 safety meeting. DE 1-1 at 12. An increase in an employee benefit to stifle union activity is prohibited. *See V & S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 278 (6th Cir. 1998). "The danger inherent in well-timed increases in benefits

---

[12] Smyrna does not argue that this statement is proof of a consequential historical practice of *soliciting* grievances.

is the suggestion of the fist inside the velvet glove. Employees are not likely to miss the inference that the source from which future benefits must flow and which may dry up if it is not obliged." *NLRB v. Exchange Parts Co.*, 84 S. Ct. 457, 459 (1964). When faced with a benefit not normally awarded, employees could reasonably infer its connection to union activity. *See B & D Plastics, Inc.*, 302 NLRB 245, 245 n.2 (1991) (noting that a cookout was "a more random event than a customary or consistently conferred benefit" that could allow employees to "reasonably view it as one intended to influence their votes in the election").

The Court finds reasonable cause to believe that Smyrna violated the Act when it, via Brooks, gave $100 cash bonuses to drivers at the Winchester plant. Smyrna argues that this practice is historic. *See* DE 25 at 16 n.15.[13] However, this was the first time Brooks provided the bonus to the Winchester drivers. R. at 1197. Brooks did not provide comparable bonuses to the Nicholasville or Georgetown drivers. R. at 1197–99. On these facts, there is reasonable cause to believe that the bonuses were a "random event" to the drivers at Winchester and that they, a week after Copher's sudden sacking, could reasonably view the bonuses as intending to influence their union choices. *See B & D Plastics, Inc.*, 302 NLRB at 245 n.2. In fact, Brooks claimed that the bonuses were not "just to try to boost morale" but to also "push them to do what I'm asking them to do." R. at 1111–12. What Brooks was "asking them to do" is a debated question, but the Board has a substantial and plausible non-union take on the general manager's animating goal.

The requested relief is just and proper. Smyrna argues that the requested relief will prevent them from "granting any benefit lest it be hauled into Court on contempt allegations." DE 25 at

---

[13] The ALJ rejected this argument and discounted Smyrna's evidence because "the record shows that some of these bonuses were given to management (dispatchers) and only occasionally to rank and file drivers[.]" DE 26-1 at 6. The Court bases its decision solely on analysis of the Petitioner's burden establishment.

16. The requested relief is clear and narrow: the Board asks that Smyrna be enjoined from "granting or promising benefits *to discourage Union activity*[.]" DE 1 at 9 (emphasis added). The relief thus restores the status quo before Smyrna's violation, reinforces governing law, and leaves ultimate remedial power in the hands of the Board. It does not, as Smyrna suggests, prohibit Smyrna from giving bonuses in line with its actual documented and historic practices or that are otherwise free of taint.

### d. Winchester Plant Redesignation and the Remaining Drivers

The Board argues that the termination of the remaining drivers and the redesignation of the Winchester plant to an on-demand facility violated the Act. *See* DE 1-1 at 15–16. The shuttering of an individual plant and the related termination of employees calls for analysis under the *Wright Line* test. *See, e.g., Armstrong Rubber Co. v. NLRB*, 849 F.2d 608 (6th Cir. 1988). An employer may terminate its entire business for any reason, but if it terminates only a *portion* of the business for the purpose of chilling anti-union activity across the board, the termination violates the Act. *See Textile Workers Union v. Darlington Mfg. Co.*, 85 S. Ct. 994, 1002–03 (1965). "[I]f an employer's conduct significantly interferes with protected rights and there is no legitimate business justification for this conduct, unlawful motive may be inferred[.]" *National Cash Register Co. v. NLRB*, 466 F.2d 945, 968 (6th Cir 1972) (citing *Darlington*, 85 S. Ct. at 1002–03). Under *Darlington*, a prima facie case of unfair labor practices in the context of plant closure exists where:

> [T]he persons exercising control over a plant that is being closed for antiunion reasons (1) have an interest in another business, whether or not affiliated with or engaged in the same line of commercial activity as the closed plant, of sufficient substantiality to give promise of their reaping benefit from the discouragement of unionization in that business; (2) act to close their plant with the purpose of producing such a result; and (3) occupy a relationship to the other business which makes it realistically foreseeable that its employees will fear that such business will also be closed down if they persist in organizational activities[.]

85 S. Ct. at 1002.

15

Using the requisite cabined inquiry, the Court finds reasonable cause to believe that Smyrna violated the Act, under the *Wright Line* test, when it redesignated the Winchester plant to an "on-demand" status and terminated the remaining Winchester drivers. Brooks's attributed statements, that "we are not going to try to run a company with our hands tied behind our back" and that he would rather "shut this place down first" are direct indications of an anti-union purpose in redesignating the plant. R. at 751–52. Furthermore, there is no question that Smyrna had interests (interests administered by general manager Brooks) in the Georgetown and Nicholasville plants, which received the transferred Winchester work. R. at 733. The balance shifts to Smyrna to provide a "legitimate business justification" for shuttering the plant and terminating the drivers. *See National Cash Register*, 466 F.2d at 968.

Smyrna argues that, based on its own metrics, the plant was running below its desired efficiency. DE 25 at 19. Thus, numerically, Smyrna had an arguable reason to convert Winchester to an on-demand plant. *Id.* The Court is not equipped to finally resolve the *Darlington* test. *See Muffley*, 551 F. App'x at 827 (cautioning district courts to "be mindful not to adjudicate the merits" of the claims in the 10(j) proceeding). Suffice it to say, the Board has met its insubstantial burden in supporting a prima facie case under *Darlington* that the plant's redesignation and the drivers' terminations violated the Act. The record raises significant questions about Smyrna's analysis and motivations. Brooks suggested or participated in the closure decision. The Winchester plant had sharply increased its production in 2019 and had improved its efficiency at the end of the year. Further, Brooks attributed the problems more to plant ethos than to financials, citing the "overall culture of the plant," R. at 1114 (regarding Highley) and that "[t]hey really weren't what we were looking for as employees." R. at 1125 (regarding the drivers); *see also* R. at 1596 (Hollingshead

describing employees, "folks just wasn't getting on board"). In context, at this stage, these ambiguities fairly favor the Board when assessing the impetus behind the plant closure.

The requested relief is just and proper in case circumstances. The Board requests that the Winchester plant be restored "to the status quo prior to January 7, 2020" (the date of redesignation) and reinstatement of the drivers. DE 1 at 9. Smyrna argues that the Board has failed to meet its burden in proving the relief is just and proper. DE 25 at 18. Smyrna further argues that reopening Winchester to full capacity would impose undue hardship, be overly burdensome, and adversely impact current employees. DE 25 at 19. However, the Board has provided evidence the Winchester plant has mechanics still employed at the plant and that concrete is still run out of the plant. R. at 723–724. Furthermore, the Board presented evidence that other drivers voluntarily left. R. at 192, 304. According to the Board, these vacancies track the downshift in Smyrna's production. DE 31 at 8–9. On the current record, Smyrna has not shown an undue hardship that would make reopening the Winchester plant unjust and improper. *Contra Calatrello v. Automatic Sprinkler Corp. of America*, 55 F.3d 208, 215 (6th Cir. 1995) (affirming injunction denial where "the company . . . [had] already subcontracted all its labor work and sold all of its tools, equipment, and materials required to perform the labor work that the Company now subcontracts"). Further, the current record demonstrates the chilling effect of terminating drivers at a plant where known union activity had occurred. *See, e.g.,* R. at 432. Reinstatement is just and proper to cure the chill and preserve the Board's remedial power. *See, e.g., Ahearn*, 351 F.3d at 239 (collecting cases).

Here, restoration of the status quo ante is both possible and warranted. Denying the remedy, as time continues to pass[14], threatens to enervate, progressively, the vitality of any ultimate Board

---

[14] The Court rejects administrative delay as helpful to Smyrna. *See, e.g., Gottfried*, 818 F.2d at 495–96 (a six-month delay between complaint and Section 10(j) petition is insufficient to defeat the two-prong analysis); *see also Sharp v. Webco Indus., Inc.*, 225 F.3d 1130 , 1135–37 (10th Cir.

remedy. In its discretion, the Court has looked carefully at the state and specifics of the record in evaluating the scope of remedy. *See Calatrello,* 55 F.3d 208, 214 (6th Cir. 1995) ("The inquiry whether injunctive relief is 'just and proper' is committed to the discretion of the trial judge.").

The structure of the Central Kentucky region certainly long-supported the three-plant model. Indeed, even under Smyrna's view, a more efficient Winchester, perhaps one with employees better buying in, would have continued on. Further, the personnel cross-over, with Brooks in charge of the full region and the movement of Newell and Goss from plant-to-plant, sharpens the risk that the Winchester anti-union conduct would foreclose any union activity throughout the area, if not beyond. *Cf. Aguayo ex rel. N.L.R.B. v. Quadrtech Corp.*, 129 F. Supp.2d 1273, 1277–78, 1280–81 (C.D. Calif. 2000) (ordering a facility restored after Respondent relocated the plant to Mexico after making "menacingly portentous" statements regarding union activity). This implicates specific organizing rights and the public interest, as reflected in the NLRA.

Under the Board's supported theory, Smyrna acted with certainty and celerity when it learned of the nascent union activity. Failing to reset the scene and recall the runaway shop now would essentially reward Smyrna's decisiveness to the clear detriment of the potential for unionization, the vitality of organized employee activity at the company, the interests of the separated workers, and the intent of Congress. Smyrna points to the lack of organizing conduct after mid-November; to the Court, that unsurprising fruit of the Winchester purge simply proves the underlying point. The remedy is significant but here ordered not as of right but rather on

---

2000) (same but with a seven-month delay); *Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 248–49 (3d Cir. 1998) (same but with a fourteen-month delay). The Board has, per its framework, diligently pursued relief.

discretionary consideration of all factors, to include the cause shown, the need to preserve remedial efficacy, and the equities involved in the case.[15]

   **e.** The Separation Agreements

   Finally, the Board argues that the separation agreement (one version) signed by the terminated drivers violated the Act and should not bar their reinstatement. DE 1-1 at 16–17. An employer "may condition a settlement on an employee's waiver of Section 7 rights if the waiver is narrowly tailored to the facts giving rise to the settlement and the employee receives some benefit in return for the waiver." *S. Freedman & Sons, Inc.*, 364 NLRB No. 82, at *2 (Aug. 25, 2016). "The Board has found unlawful, however, settlements that prevent a signatory employee from exercising rights that are unrelated to the facts giving rise to the settlement." *Id.* In *S. Freedman & Sons*, the Board cited prior cases where an employee was barred from participating in the prosecution of *any* claim against the employer. *Id.* The Board found a confidentiality agreement contained to the terms of the settlement agreement (*i.e.*, confidentiality *about* the settlement agreement itself) was narrowly tailored. *Id.*

   The Court finds reasonable cause to believe that the separation agreement as signed by the terminated drivers violated the Act. The separation agreement, in contrast to the one in *S. Freedman & Sons*, is arguably overbroad. The release breadth does not specify any acts or claims relative to disputed labor practices but rather is a general release blanketing all prior acts. In the "Covenant Not to Sue" paragraph of the agreement, it states that the parties are free to bring suit *only* in front of the Equal Employment Opportunity Commission (EEOC). DE 11-4 at 4. The paragraph further instructs the parties to "construe[ the paragraph] as broadly as lawfully possible." *Id.* Critically, the non-disparagement component applies generally, without tether to particulars

---

[15] The ALJ's parallel and harmonious analysis is further confirmation.

released. By its terms, the paragraph is not narrowly tailored to the facts of the settlement. By specifying reservation of a claim relative to the EEOC, not including claims brought to other administrative entities, not limiting non-disparagement to a defined event, and instructing the parties to read the agreement as broadly as possible, the agreement arguably stifles Section 7 rights. There is no indication that the terminated employees may 1) join an unfair labor practices lawsuit, or 2) provide any assistance to other employees wishing to file such a lawsuit. Because the agreement is broad and was presented to the employee's in the context of a colorably discriminatory discharge, the Court finds reasonable cause to believe that the agreement violated the Act. *See Shamrock Foods Co.*, 366 NLRB No. 117 at *3 n.12 (2018) *enforced*, 779 F. App'x 752 (D.C. Cir. 2019).

Smyrna does not vigorously argue the contents of the separation agreement in its brief. *See* DE 25 at 20–24. Instead, it argues that reinstating the employees would not be "just and proper" in light of the enforceability of the separation agreement. *Id.* at 20–22. The Board in *Independent Stave Co.* provided non-exclusive factors to consider when evaluating the enforceability of a separation agreement:

> (1) whether the charging party(ies), the respondent(s), and any of the individual discriminatee(s) have agreed to be bound, and the position taken by the General Counsel regarding the settlement; (2) whether the settlement is reasonable in light of the nature of the violations alleged, the risks inherent in litigation, and the stage of the litigation, (3) whether there has been any fraud, coercion, or duress by any of the parties in reaching the settlement; and (4) whether the respondent has engaged in a history of violations of the Act or has breached previous settlement agreements resolving unfair labor practice disputes.

287 NLRB 740, 743 (1987).

The parties analyze the *Independent Stave* factors in briefing. DE 1-1 at 21–23; DE 25 at 22–23. The Court will not attempt to replace or pre-analyze the Board's complete scrutiny of the *Independent Stave* factors. The Court notes that, having reasonable cause to believe that the

20

separation agreement violates the Act, the agreement is of doubtful effect.[16] The Board takes that position, and the cases, including *Shamrock Foods* and *Baylor University Medical Center*, 369 NLRB No. 43 (2019) (which did not involve a plant closure or alleged discriminatory termination), support the view that, in this context, the agreement has significant faults. Smyrna's dangling of two extra weeks, in this context, cannot forestall the remedy warranted by the full record. Even the company concedes, as Brooks did at the time, that the bar on reinstatement, a textual part (what Smyrna calls "boilerplate language," DE 25, at 23) of the agreement, is inapplicable. Brooks assured the workers they would be eligible to return in the spring.[17] The Court finds it just and proper to return the parties to the status quo; whatever the other effects of the settlements, if any, they do not bar or displace reinstatement of the remaining drivers as the proper remedy.

## IV.    CONCLUSION

The Court concludes that there is reasonable cause to believe that Smyrna violated 29 U.S.C. §§ 158(a)(1), (3) and that such conduct will likely be repeated or continued unless enjoined. Under the Board's substantial and record-supported theory, Smyrna acted with the very design of squelching, permanently, union activity centered on and originating at the Winchester plant. The Board processes must unfold, and the Court must preserve a meaningful remedy and guard the public and other affected interests in a just and proper way. Therefore, the Board's petition for a

---

[16] The ALJ noted that the *Independent Stave* test favored Petitioner in part because "the settlement is unreasonable in exacting promises never to apply for employment again with SRM and requiring the discriminatees to sacrifice some of their Section 7 rights[.]" DE 26-1 at 27. The Union was not a party signatory. The two-week premium, in this scenario, is of questionable reasonableness, as the ALJ himself found.

[17] The Court finds it interesting that Brooks gave such assurances, which are counter to the agreement and counter to Smyrna's view that the Winchester employees were so underperforming that they essentially forced closure of the plant. The employees did not understand the company's alleged views at the time of separation.

temporary injunction (DE 1) pursuant to Section 10(j) of the NLRA is **GRANTED**, on stated terms, pending a final adjudication by the National Labor Relations Board.

Accordingly, the Court **ORDERS** that:

1. Smyrna Ready Mix Concrete, LLC, its officers, representatives, agents, servants, employees, successors and assigns, and all persons acting in concert or participation with it, be enjoined and restrained from:

   a. discharging or otherwise discriminating against employees for supporting Gen. Drivers, Warehousemen & Helpers Local Union 89, affiliated with International Brotherhood of Teamsters, AFL-CIO, or any other labor organization;

   b. discharging supervisors because of refusal to commit unfair labor practices against employees seeking to unionize;

   c. converting its Winchester, Kentucky facility to an "on demand" location and laying off employees of the Winchester facility because of employees' support for the Union and/or protected concerted activities;

   d. granting or promising benefits to discourage union activity;

   e. impliedly promising benefits by soliciting grievances to discourage union activity;

   f. maintaining and enforcing the Separation Agreement and General Release that it required its employees to sign as a condition of receiving complete severance pay; and

   g. in any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them under Section 7 of the Act.

2. Smyrna Ready Mix Concrete LLC, its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with it, shall take the following affirmative action:

   a. within **seven days** of this Order, offer in writing, to James Bowling, Randall Carmichael, Sungha Copher, Nicole Long, Aaron Highley, Jason Means, David Smith, and Sheldon Walters interim reinstatement to their former positions; or, if those positions no longer exist, to substantially equivalent positions without prejudice to their seniority or any other rights and privileges previously enjoyed, displacing, if necessary, any employee who may have been hired or reassigned to replace them;

   b. within **seven days** of this Order, restore Respondent's Winchester, Kentucky facility to the status quo that existed prior to January 7, 2020, including transferring back work and reinstating employees listed above who accept offers of reinstatement;

   c. within **seven days** of this Order, post copies of this Order at Respondent's Winchester, Kentucky facility where notices to employees are customarily posted; said posting shall be maintained during the pendency of the Board's administrative proceedings free from all obstructions and defacements; all employees shall have free and unrestricted access to said posting;

   d. within **twenty days** of this Order, file with the Court, with a copy submitted to the Regional Direct of Region 9 of the Board, a sworn affidavit from a responsible Smyrna official, setting forth with specificity the manner in which

23

Smyrna has complied with the terms of this decree, including reinstatement status and how it has posted the documents required by the Court's Order.

3. This case shall remain on the docket of this Court, pending compliance by Smyrna Ready Mix Concrete LLC with their obligations specified above, and upon disposition of the matters pending before the Board, the Petitioner **SHALL** cause this proceeding to be dismissed.

This the 28th day of January, 2021.

Signed By:

_Robert E. Wier_

**United States District Judge**